## HARPER a. RAYMOND.

*New York Superior Court ; General Term, April, 1858.*

CONSTRUCTION OF CONTRACTS.—PARTIES.—EVIDENCE.

The articles of an unincorporated Joint Stock Association provided in substance, that either of the associates might sell any of his shares of stock; but that, before selling them to any other person, he should offer them to the Association; and that no sale should give the purchaser any control in the business, nor any interest in profits, until scrip should be issued to him by the other associates.

*Held,* 1. That a sale of shares without an offer to the Association was valid, but did not constitute the purchaser a partner, nor did it work a dissolution ; but the purchaser, being registered and getting his certificate, could demand and receive dividends declared to his vendor, on a power of attorney from him.

2. That the assignor of the shares was not a necessary party to an action by the purchaser, against the association, for a dividend.

Where a contract in writing is made contemplating the subsequent execution of an instrument—*e. g.,* an assignment of stock,—and such instrument is afterwards executed, delivered, and accepted in pursuance of the contract, the contract and instrument contracted for may be read together to determine the intent of the parties ; but if the last in date is unequivocal, it must control the former.

A contract in writing was made for the sale of certain stock, and all the " right, title, and interest" of the holder therein ; and on the following day an assignment was made by the seller, and accepted by the buyer, as a full performance of the contract. This assignment transferred the stock, " and all *future* benefit and dividends thereof."

*Held,* that the title to any dividend declared on the stock prior to the contract of sale, but not drawn by the seller, did not pass by the sale.

Dividends declared periodically, under articles of a Joint Stock Association, are subject to be reduced, on the retiring of the shareholder to whom they are declared, by deducting his share of any debts of the association which were not considered in declaring such dividend.

Submission of a controversy without action, under section 372 of the Code.

Articles of association were entered into on the 5th day of August, 1851, between Henry J. Raymond, George Jones, and Edward B. Wesley, for the purpose of establishing and carrying on a daily newspaper, to be called the New York Daily Times, and a weekly newspaper, to be called the Weekly Times.

The title of the association was to be " Raymond, Jones & Company." The three persons named were to be the sole

directors, until further articles should be agreed upon and signed.

Jones and Wesley were each to contribute, in cash, $20,000, to form the cash capital of the concern.

The whole of the property was to be divided into, and consist of one hundred shares, to be called capital stock, of one thousand dollars a share—of course, to be one hundred thousand dollars. Jones was to have forty shares, Wesley forty, and Raymond twenty shares.

The profits were to be ascertained and divided on the first day of January and July, in each year.

The sixth and important article, as bearing upon the questions in this case, was as follows:

" *Sixth.*—Each of the parties hereto shall have the right to sell any portion of his shares of said stock ; but before selling the same to any other person, he shall offer the same to the association, giving them the refusal thereof for ten days. But no sale of any such shares shall give to any purchaser thereof any right to interfere in the conduct, management, or affairs of said newspapers, or either of them ; and no such purchaser shall acquire any interest whatever in the profits of said papers till he shall have received a certificate or scrip for his said shares, signed by all the parties hereto, and duly registered in a book to be kept for that purpose ; which scrip shall always express from whom the said shares were purchased, and shall certify that the holder of said scrip takes the same with notice of and subject to the articles of association between the parties hereto, and is entitled to participate in proportion to his shares, only in that portion of the profits which may be assigned to the party so selling to such purchaser, and shall not be entitled to any voice or agency whatever in the conduct, control, management, or affairs of said company, or of said newspapers."

Fletcher Harper, Jr., had become, by November 22, 1853, a purchaser from Jones and Wesley, of thirty shares, and the articles are to be regarded as fully complied with in his case.

The certificate or scrip issued to him, and dated the 29th day of November, 1853, refers to the terms contained in the articles of the 5th day of August, 1851. On the 25th day of May, 1854, the thirty shares were registered in his name.

In July, 1855, a dividend of profits was made. Four thou-

sand five hundred dollars were allotted to, and received by Fletcher Harper, Jr., for his proportion of such profits on the thirty shares.

On the 29th day of July, 1855, Fletcher Harper, Jr., executed and delivered to Fletcher Harper, the plaintiff, the following instrument:

"Know all men, &c., that I, Fletcher Harper, Jr., for value received, have bargained and sold, assigned and transferred, unto Fletcher Harper, thirty shares of the capital stock standing in my name on the books of The New York Daily and Weekly Times newspaper establishment, and hereby constitute him my true and lawful attorney, to sell, transfer, &c.," the usual power of attorney.

Fletcher Harper, the plaintiff, retransferred one share to Fletcher Harper, Jr.

On some day in November, 1855, the plaintiff apprised the associates, Raymond, Jones, and Wesley, in writing, of the assignment to him, demanded a transfer and the issue of new scrip, and offered the surrender of that issued to Fletcher Harper, Jr. He was therefore apprised, or must be treated as apprised, of the terms of the articles of association.

On the 31st of December, 1855, an account of profits for the preceding six months was taken, and the sum of $3000 was entered on the books of the association as follows:

"Cash-book. Stock in dispute, thirty shares, $3000."

Their due proportion of the profits was credited on the books to the other associates and owners, respectively.

On the 28th day of January, 1856, Wesley gave notice that he dissolved the partnership then existing between the parties; viz., Raymond and Jones, and those subsequently admitted. On the 29th day of January, Raymond and Wesley, in effect, accede to the dissolution, engaging, as directors, to continue the publication until the stock and good-will could be disposed of.

On the 30th day of January, 1856, as the case states, the following agreement was made between Fletcher Harper, Fletcher Harper, Jr., and Edward B. Wesley, one of the present defendants, by which "the thirty shares of stock standing in the name of Fletcher Harper, Jr., on the books of the establishment, *and all my and his right*, title, and interest therein, for $50,000, payable on the 31st day of January," the next day.

This was signed Fletcher Harper, by F. N. Bangs, and was accepted in writing by Wesley. F. N. Bangs was duly authorized, by Fletcher Harper and Fletcher Harper, Jr., to make these contracts, and to give a receipt for the $50,000, which he did on the 31st day of January.

On the said 31st day of January, 1856, an instrument was executed by Fletcher Harper, and delivered to Wesley, as follows:

"Know all men, &c., that I, Fletcher Harper, for value received, have bargained, sold, assigned, and transferred unto Edward B. Wesley, thirty shares of capital stock, standing in the name of Fletcher Harper, Jr., on the books of the New York Daily and Weekly Times newspaper establishment, and all future benefit and dividends thereof, and do constitute and appoint the said Edward B. Wesley my true and lawful attorney, &c.," in the general language of a power of attorney.

The thirty shares were transferred to Wesley on the books.

On the 1st day of February, 1856, the following instrument was executed by Fletcher Harper, Jr., to Fletcher Harper:

"Know all men, &c., that I, Fletcher Harper, Jr., of the city of New York, for and in consideration of the sum of one dollar, &c., by Fletcher Harper, the receipt whereof, &c., have granted, bargained, and sold, transferred and assigned unto the said Fletcher Harper, all and singular the dividend and dividends heretofore declared, or credited, on thirty shares of stock of The New York Daily and Weekly Times establishment, standing in my name, and all sums of money due to me by the said establishment for dividends or profits, and not yet claimed by, or paid to me; to have and to hold the same, unto the said Fletcher Harper, his, &c., to his and their use and benefit absolutely."

Since January 1, 1856, the defendants have paid $9550, in discharge of debts accrued before January 1, 1856. Of this amount, $4100 was in payment of rent accrued from the 1st day of May, 1854. When the dividend was declared, no reservation was made to provide for this debt, the amount not being adjusted with the landlord. It has since been paid out of the general fund of the association, but no portion has been paid by Fletcher Harper, Jr., directly or indirectly. The residue of the $9550 was applied in payment of other debts that were considered at the time of the dividend.

The dispute as to the thirty shares noticed in the entry in the cash-book, before stated, was a controversy between Fletcher Harper, Jr., and George Jones, the latter claiming them under an alleged contract of sale, made to him by the former. This controversy existed in October, 1855.

*F. N. Bangs*, for the plaintiff.

I. On December 27th, 1855, the time when the amount in question was ascertained and apportioned, no other person than the plaintiff or Fletcher Harper, Jr., was entitled either to receive it from the partnership, or to have credit for it in the partnership accounts. 1. The defendants disclaimed any title to it, by crediting and paying to themselves specific amounts, as being all of the profits which they could claim. 2. The assignment by Fletcher Harper, Jr., to the plaintiff, of his thirty shares, was rightful, being expressly permitted by the articles. His neglect to offer them to the association may have been a breach of contract, but did not by any agreement of the parties, or by operation of law, work a forfeiture of the shares. 3. The articles, in providing that a purchaser should not acquire any interest in the profits until he had received scrip, could not operate also to divest the seller of that interest, for that would operate as a forfeiture, and the association, by refusing to purchase, and then refusing to issue scrip, might render the privilege of sale valueless.

The better construction of this clause is, that it was intended only for the protection of the association against its debtors, and that until the issue of new scrip, the party in whose name the shares stood on the books, and who was named in the outstanding scrip, would be, as against the association, entitled to the profits, being himself liable to account to his vendee. (Bank of Utica *a.* Smalley, 2 *Cow.*, 780; Gilbert *a.* Manchester Co., 11 *Wend.*, 627.) The articles do not contain any provision authorizing any sale of profits *eo nomine*. But if the views hereafter suggested respecting these profits are sound, then they were capable of being separately conveyed. And if, as against the association, the right to the dividend was not in plaintiff at the time its amount was ascertained, then it was in F. Harper, Jr., and passed to Wesley, by plaintiff's assignment, or to the plaintiff by F. Harper, Jr.'s assignment of February 1, 1856. That

assignment was made after both parties had ceased to be entitled to any scrip, and a case existed to which the provision in article sixth did not apply.

II. The sale to the defendant Wesley, made by the plaintiff on January 31, 1856, was not such as to justify the defendants or the association in withholding previously ascertained profits from the party entitled to them at the time they were ascertained, in deference to any title acquired by Wesley, who acquired *no* title. 1. The instrument by which the sale was perfected confines its own operation, in express terms, in respect of profits, to "*future* benefits and dividends." 2. That instrument, in its provisions, pursued the terms of the previous less formal agreements; or, if it does not, the variance is deliberate, and not affected by any pretence of fraud, trickery, undue advantage, misapprehension, concealment, duress, or other vitiating circumstances. It was drawn fairly, considered deliberately, accepted understandingly. The sale is made "*subject to any claim of George Jones.*" This is not in the preliminary agreement. From the fact of this insertion, the inference is, that the instrument was deliberated on, and deliberately completed. 3. If this instrument contained no reservation of past benefits, profits already ascertained and appropriated would not have been included in its operation. 4. The contemporaneous construction of the parties to Fletcher Harper's assignment, is in accordance with this view.

III. Fletcher Harper, Jr., if entitled to the profits ascertained on December 27, 1855, at all, was entitled to their immediate and separate use—that is, he was not bound to leave them mingled with the funds or property of the association. The proof of this is contained in the fifth of the articles of association, which provided that the profits were to be ascertained—not to gratify the curiosity of the parties, but in order that they might be divided. They were to be ascertained, and by a physical division separated from the capital stock, which latter consisted in the goods and chattels, &c., " of the association." They were to be individualized, not by a mere credit on the books, but by a division.

IV. There being a right in Fletcher Harper, Jr., to an immediate division of his ascertained portion of the profits, which right continued in him until it was assigned to the plaintiff, he,

and afterwards the plaintiff, became entitled to an action in some form against those who withheld the enjoyment of the right. He could not, like the defendants, draw the funds by his own act. His only remedy was a legal proceeding in some form.

V. If the legal rights and relations of the parties were as above contended, then either the plaintiff or his assignor might have maintained an action, as upon a contract for the payment of money, to recover the dividend. No legal maxim which prevailed before the distinction between law and equity was abolished, could defeat such an action.

If it is said, in language now obsolete, that no "*action at law*" can be maintained between partners, the answer is, first, that this is not an "*action at law*." It is an action on the facts, in which a judgment is asked appropriate to the injury complained of; and, secondly, the case would have been within the established exceptions to the rule.

VI. Actions at law between partners were maintainable for balances not final, as follows: 1. Where, a balance being ascertained, there was an express promise to pay it. (Preston *a.* Strutton, 1 *Anst.*, 50; Moravia *a.* Levy, 2 *Term R.*, 483; Clark *a.* Dibble, 16 *Wend.*, 601.) 2. Where the account is complete in itself, as to all prior transactions, and the balance is not carried forward, nor intended to be carried forward as an item in the partnership account, nor as a mere preliminary to a final accounting. (Brierly *a.* Cripps, 7 *C. & P.*, 709.) 3. Where the evident intention of the parties is that the particular balance claimed shall be the subject of a distinct settlement, without reference to other items or unsettled accounts. (Jackson *a.* Stopherd, 2 *Cromp., M. & W.*, 361.) 4. Where any thing has happened which divests the partners of their joint property, and vests it in one, or when the amount claimed has been separated from the partnership account. (Coffey *a.* Brian, 3 *Bingham's R.*, 54.) 5. When a specific promise or arrangement between partners, in respect to a part of the common fund, has taken it out of the general account in equity, it has been made the subject of an action at law. (Townsend *a.* Goewey, 19 *Wend.*, 430.) 6. When the contract, though made concerning the partnership affairs, and in furtherance of the joint undertaking, is the individual contract of the partners who are parties to it. If it is made by them in their own name, and not in the name of

the firm, an action may be maintained thereon by one against the other, during the continuance of the partnership. (Venning *a.* Leckie, 13 *East.*, 7; Duncan *a.* Lyon, 3 *Johns. Ch. R.*, 363; Wilby *a.* Phinney, 15 *Mass.*, 120; Glover *a.* Tuck, 24 *Wend.*, 153; Wright *a.* Mechie, 6 *Grattan's Va. R.*, 354; *Gow on Partnership*, 3d Am. Ed., 72, 73.) 7. Where there is an express covenant to do the thing for not doing which the action is brought, and the damages are not payable into, or recoverable (immediately) out of a partnership fund, even though the defendants are entitled to an indemnity against the recovery out of a fund to which the plaintiff is bound to contribute, jointly with themselves and others. (Bedford *a.* Brutton, 1 *Scott*, 245; Andrews *a.* Ellison, 6 *B. Moore*, 199.) 8. The rule itself (in Gibson *a.* Moore, 6 *N. H.*, 547) is stated accurately, thus: " So long as the partnership continues, and the concerns of it remain unadjusted, *the law will raise no implied promise by one to pay the other upon a partnership transaction.*" " But, by agreement between the parties, in relation to a specific portion of the partnership transactions, they have been separated from the rest of the partnership affairs. *As to them the partnership is dissolved.*" (See also Van Ness *a.* Forrest, 8 *Cranch.*, 30.) In no one of the cases cited could the action have been maintained if not in this. Clearly the amount when recovered will not be payable into a partnership fund, nor would the plaintiff, if still a partner, be required to contribute to a recovery, if a recovery were had against the defendants personally. The effect of such a recovery would be to substitute the defendants for him in his relation to the dividend. On the other hand, if the judgment of the court directed the defendants to pay and divide to the plaintiff a specific sum out of the profits ascertained on December 27, 1855, neither his interest in the capital, nor the capital as a whole, would be diminished. The effect would simply be, that his claim on that particular fund would be exhausted.

And, these being the sole effects of a recovery in either form, the reason for the rule which prohibited actions at law between partners would cease. The recovery, far from opening new accounts for future adjustment, would close and finally adjust the whole account.

VII. *As to parties.* This proceeding may, in respect to the

question of parties, be treated either as an action against the defendants personally to recover damages equal to the amount of the dividend which they withhold, or as a proceeding against a particular portion of the partnership property, to compel a perfect, and complete a partial, division thereof.

The plaintiff's point is, that in either view, all the necessary parties are before the court. 1. As to the second view: It does not appear as a fact in the case that any other person than the parties to this controversy, or those whom they respectively represent, had any interest in the capital or profits at the time the dividend was ascertained, or at the time the plaintiff's title accrued. 2. As to the first view: If the plaintiff had brought what would have been an action at law, the action would have been founded on an express contract contained in the articles of partnership, viz., the agreement that the profits should be ascertained and divided.

That is not an agreement of the partnership. It was originally an agreement of the parties with each other. As between the original parties, neither was exclusively charged with the duty of ascertaining and dividing; but, as between them and subsequent purchasers of stock who bought "subject to the articles," the obligation arising upon this contract was on the defendants exclusively.

The purchaser was not to be entitled to any voice or agency in the conduct, control, management, or affairs of the business. And, therefore, it follows that the defendants only could have been sued on or after December 27, 1855. F. Harper, Jr., could not have been joined as a defendant then or at any time afterwards, for he had ceased to be a director. Jones, too, had temporarily ceased to be a director, but he resumed his place under the articles, and when the dividend was demanded by plaintiff, all the defendants owed to him the duty of dividing ascertained profits. Then, if plaintiff recovered damages, as such, from defendants, to the amount of the dividend, the only consequence being that they would be substituted for him in his relation to the dividend, no one else could be called on by them to contribute to the recovery. The defendants would get a perfect indemnity from the fund to which the action related.

VIII. The facts stated in the case, as to the payment of debts by the associates, do not constitute any absolute bar to a re-

covery. (Clark *a.* Dibble, 16 *Wend.,* 601.) They do not even diminish the amount of the recovery.

These facts are, that the defendants have paid sundry sums of money in discharge of debts of the association, accrued prior to January 1, 1856, viz.:

$4100 for rent—from May 1, 1854, to January 1, 1856—for which no reservation had been made prior to January 1, 1856, from the gross profits of the association, because the amount had not been adjusted with the landlord; and

$5450 in payment of other debts which were *considered* at the time of the dividend.

These sums, though paid *by the defendants,* were paid out of the general treasury of the association, and dividends have since been made. The association made the payment, but the defendants were the agency through whom it was made.

The circumstance that the last-mentioned payment, $5450, was taken into account at the time of the dividend, is a conclusive answer to any counter-claim founded on that payment. The plaintiff, or his assignor, has already contributed to it, because the " consideration" of it diminished the amount of profits to which he otherwise would have been entitled, as much as the payment of it at that time would have done.

The payment of the other sum is the subject of the next point.

IX. The defendants could not compel the plaintiff, nor his assignor, if either of them had received the dividend in question, to contribute any thing towards the payment of $4100, made out of the general treasury of the association, as mentioned in the case, because,—1. The capital and unascertained profits of the association, as it at that time existed, constituted the proper fund for the payment of debts, and no contribution *in addition* to the capital could be compelled until that was exhausted. The plaintiff never withdrew any thing from the capital. His assignment to Wesley conveyed only what should remain after payment of debts, and Wesley took the assigned interest subject to the payment of debts then unpaid. 2. Fletcher Harper, Jr., never became liable to the defendants for any portion of the capital. He was not a party to the original articles, contributed nothing to the capital, and became interested in it only by purchase. There was no obligation upon him to contribute to any loss which did not absorb the entire capital: but if there were,

3. It does not appear that the payment of the debt in question impaired or diminished the capital to any extent. 4. Raymond and Jones cannot maintain or join in a suit for contribution against either of the Harpers, in respect to that debt, because the case does not show that they have paid a larger proportion of it than they were justly chargeable with. Nor, for the same reason, could Wesley, as the holder of the shares which he previously owned, join with Raymond and Jones in such a suit.

If such a joint suit could possibly be brought, or if Wesley could maintain such a suit, he, as the holder of the thirty shares, would be exclusively entitled to the amount recovered, and then he would have the same benefit as if Harper, in his assignment to him, had agreed to indemnify him against debts, or had assigned a part of the dividend.

And it is submitted that if the defendants could not have compelled either of the Harpers to contribute to this payment directly, they can have no lien upon previously ascertained profits due to individual associates, or any part of them, on the ground that they have made the payment out of the general treasury.

If they had such a lien, and can retain the whole dividend, for the purpose of applying it to that debt, the effect would be to apply the share of profits in dispute to the payment of debts, which the previous profits of the defendants did not contribute a cent to.

If on that ground they can retain three tenths of the dividend, the effect would be—1. To put Wesley in a better position than the plaintiff would have been in, if he had retained the assigned interest. For if the plaintiff had retained his shares, his profits for the next half year would have been diminished by his proportion of this payment, whereas, if the same proportion of the $3000 in controversy is applied to that debt, the thirty shares assigned to Wesley will already have contributed the proportion with which they are justly chargeable, and Wesley will be entitled to so much more out of the ascertained profits. 2. To put Wesley, as to the thirty shares, in a better position than either of the other defendants, in respect to their shares. For, as they did not contribute to this payment out of their previously received profits, their accruing profits would be diminished by their several proportions of the debt; while, if the

thirty shares contributed to the payment, out of its previously ascertained profits, the accruing profits on these shares would suffer no diminution whatever; and, 4. For the same reason, Wesley would be in a better position, in reference to the thirty shares, than he would be in respect of those which he previously owned. 5. The same inequality would be produced, if the case stated, and the fact were, that the defendants contributed to this debt out of their previously received profits. In that case, Raymond and Jones would have received from accruing profits only what they had previously contributed, while Wesley would receive accruing profits without having contributed any thing. In other words, he would have the same advantage as if the plaintiff had voluntarily released the dividend or a proportion of it to him.

X. If the plaintiff is properly chargeable with any portion of this payment of $4100, the court has the means of finally adjusting all matters of account between the parties, by its judgment in this proceeding. The plaintiff, if chargeable at all, is chargeable with only three tenths of that sum, viz., $1230; and a judgment for the difference between $1230 and the amount of the dividend in question, would close and finally adjust the affairs of the partnership.

*Benj. V. Abbott*, for the defendants.—I. Fletcher Harper, Jr., is a necessary party defendant to the determination of this controversy. (Smith *a.* Lusher, 5 *Cow.*, 688; Bailey *a.* Inglee, 2 *Paige*, 278; Beaumont *a.* Meredith, 3 *Ves. & B.*, 181.)

II. The claim of the plaintiff is founded on an attempt to evade the articles of copartnership, which the law should not sanction. 1. The articles provide that either party, before selling any of his shares, shall offer them to the association, giving them the refusal for ten days; and that no purchaser shall acquire any interest whatever in the profits until he has received a certificate or scrip for his shares, signed by *all the parties*. These were very reasonable means to accomplish a very honorable end—viz., to secure the independence of the newspaper intended to be established. 2. In point of fact, however, F. Harper, Jr., privately assigned his thirty shares to F. Harper, without having first offered them to the association; F. Harper then re-transferred one share to F. Harper, Jr., so as to enable

him to keep his position as a director. Then, to enable F. Harper to participate in the profits, the dividend, when made, was specifically assigned to him. This scheme, if sanctioned, completely frustrates the articles.

III. The defendant Wesley is entitled to the dividend in controversy, by virtue of the agreement and assignment of January 30 and 31. 1. The chose in action, called "thirty shares of stock" in the assignment, was, in law, simply the interest of F. Harper, Jr., in the partnership effects. That whole interest, whether capital or profits, passed by the assignment. The words "future benefit and dividends" include all profits not theretofore distributed. 2. The letters of agreement evince an intent to transfer to Wesley the entire interest of both Harpers in the concern. The assignment should be so construed, or so reformed if need be, as to effectuate that intent.

IV. Plaintiff does not show himself entitled to recover the dividend, even supposing that it was so fully disconnected from the partnership transactions that F. Harper, Jr., might have recovered it in an action at law.

V. The plaintiff, as assignee of a partner's interest, can claim no higher rights than those of his assignor. He is equally bound to abide a settlement of partnership accounts. (Nicoll *a.* Mumford, 4 *Johns. Ch. R.*, 522; Rodriguez *a.* Hefferman, 5 *Ib.*, 417; Marquand *a.* The New York Manufacturing Company, 17 *Johns.*, 525.) The utmost that the latter could claim would be to have an accounting on a proper bill filed, and to have a payment of the balance of capital and profits remaining after payment of the debts; *e. g.*, the rent. He could not sue for the $3000, nor for any specific sum. An action at law is not maintainable by one partner against his copartner, for a claim like the present, connected with the partnership affairs, except on a *final* balance, and an *express* promise to pay. (1 *Parsons on Contracts*, 139; Bovill *a.* Hammond, 6 *Barn. & C.*, 149; Robson *a.* Curtis, 1 *Stark.*, 78; Casey *a.* Brush, 2 *Cai.*, 293; Niven *a.* Spickerman, 12 *Johns.*, 402; Westerlo *a.* Evertsen, 1 *Wend.*, 532; Pattison *a.* Blanchard, 6 *Barb.*, 537; and see Murray *a.* Bogert, 14 *Johns.*, 318.) Either partner has a right to insist that the debts be paid before the shares are withdrawn. (Kirby *a.* Schoonmaker, 3 *Barb. Ch. R.*, 46; Smith *a.* Jackson, 2 *Edw.*, 28; Robb *a.* Stevens, 1 *Clark*, 191.)

By the Court.*—Hoffman, J.—The parties to the original association, in the sixth article, contemplate and allow of a sale of a share or shares; but stipulate and direct that such sale shall not constitute the purchaser a partner. They intend, also, that such a sale shall not work a dissolution of the association. They contemplate a subsequent allotment of profits to the vendor in such sale. The purchaser, being registered and getting his certificate, could demand and receive the profits declared as belonging to his vendor, by getting a power of attorney, or other authority for that purpose, from him. In fact, it seems that such vendor was to be still regarded as a partner for management. At least, he is not excluded. Upon a dissolution, the purchaser would succeed fully to all his vendor's rights and interests.

The case is, in this particular, very similar to that of Totam *a.* Williams (3 *Hare*, 347). The leading principle in each case is the prevention of the intrusion of a new partner, without the concurrence of all, and the guarding against the dissolution being produced by the transfer of any party's share. Neither his caprice nor his misfortunes are to produce this result.

As between Fletcher Harper, Jr., and Fletcher Harper, the instrument of the 29th day of July, 1855, transferred the whole stock, and every right, interest, or benefit which the ownership of the stock on that day conferred upon Fletcher Harper, Jr. The right to the future dividend passed from the latter, and vested in Fletcher Harper, he being the owner when the dividend was declared. This right followed the title to the *corpus*, as between these parties.

As between Fletcher Harper and the association, the purchase not having been tendered to the latter, nor assented to by them, Harper did not become a *partner*. He could not be intruded upon the association as such. He could not insist upon the future profits being declared to him, credited to him, or paid to him as purchaser. Fletcher Harper, Jr., was not, however, dispossessed of a nominal ownership, nor was a dissolution worked by his assignment. The profits would be declared as payable to him on the thirty shares, and a power of attorney would enable this plaintiff, Fletcher Harper, to obtain them.

---

* Present, Hoffman, Slosson, and Pierrepont, JJ.

But on or about the said 29th of July, Fletcher Harper transferred back to Fletcher Harper, Jr., one share of the thirty. The latter became then reinvested with the one thirtieth part of such stock, and when the dividend was declared, became entitled to one thirtieth of the amount.

But the dissolution of the association, or partnership, on the 29th day of January, 1856, abrogated the sixth article of the agreement; superseding, of course, all the motives and reasons for framing or continuing it. Raymond and Wesley became agents and trustees to conduct the establishment, until an advantageous disposition could be made, and thus a great loss be averted.

The consequence of this was, that the right of Fletcher Harper was no longer embarrassed, or qualified by the influence of the articles. It was entire and absolute; and I cannot doubt that, on the 30th day of January, he was entitled to the dividend in question.

Then, on the 30th day of January, Fletcher Harper, through his authorized attorney, Bangs, enters into the contract with Wesley contained in the instruments of that date, and carries such contract into effect, by executing and delivering the assignment of January 31.

After a careful consideration of these instruments, we have concluded that the right to this dividend did not pass to Wesley under them.

They may, indeed, be considered together; but if the last in date, the formal assignment, is unequivocal, it must control the question. If the preceding papers did clearly import a different meaning, and produce a different result, they would be superseded by the last and decisive instrument, as the true indication of the parties' ultimate intent. But if the first papers, being the heads of the agreement, may, when fairly interpreted, be made consistent with the final instrument, there can then no longer be room for doubt.

Now the instrument of the 31st day of January, 1856, is a transfer of the stock, the *corpus*, and *all future benefits and dividends thereof.* Whatever, then, should thereafter spring from the stock, in any form of benefit or dividend, was to pass. It is a strong exclusion of any profit or dividend which then existed, and had been separated and distinguished from the stock itself.

I admit, that if the instruments of the 30th day of January afforded the sole ground of decision, the better construction would be, that the previous dividend of December 31 passed under them. A transfer of the stock, and all right and interest therein, would, I think, be sufficient for this purpose.

Yet it seems to me impossible to deny, that these instruments are consistent, in their language, with an intent to exclude such previous dividend, and that intent is disclosed and contained in the actual assignment of the 31st day of January.

I consider the assignment of the 1st day of February, 1856, from Fletcher Harper, Jr., to the plaintiff, as totally ineffectual and inoperative as to twenty-nine parts of the dividend. If it could have any operation—that is, if Fletcher Harper, Jr., had a right to this dividend, which it professes to transfer—then, beyond doubt, that right would have gone to Wesley, under the papers of January 30. Fletcher Harper, Jr., agreed to sell every right and interest he possessed in or to the stock. There was no *scintilla* of interest in him, except connected with his dividend, and if that was in him, it passed to Wesley, or the language was nugatory. But the view I have taken shows that there was nothing in him, as to twenty-nine shares and so much of dividend. All had gone to the plaintiff, under the transfer of July, 1855.

Then one thirtieth part, and one share, would have gone, by force of the better construction of the papers of the 30th of January, to Wesley. His full acknowledgment, however, and receipt of the 31st, prove that this was not the intention, and hence the paper of the 2d of February operates as to one share.

Another question is raised, under the fifth point of the defendants, connected with the tenth point of the plaintiff. It relates to the point, whether the case does not enable the court to decide, fully and finally, every matter connected with the partnership between these parties. Of this we are entirely satisfied. The partnership, as far as concerns the plaintiff, is wholly dissolved; and, except as to this isolated sum, and the question of reduction for the rent, there is nothing which shows the least ground of claim, which can require an account.

The result is, that the plaintiff is entitled to the three thousand dollars, after deducting his three tenths of the rent, or

$1230.    We understand the parties not to differ as to this amount; or, at any rate, that they would adjust this deduction among themselves.

Judgment accordingly.